IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TRACEY HUGO,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:26-cv-558<br><br>DISTRICT JUDGE<br>J. PHILIP CALABRESE<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT & RECOMMENDATION** |

Plaintiff Tracey Hugo filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In May 2023, Hugo filed an application for disability insurance benefits, alleging a disability onset date of April 15, 2020.[1] Tr. 18, 198. In her application, Hugo claimed that she was disabled due to a nerve disorder,

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

gallstones, acute bronchitis, migraine disorder, degenerative disc disease, polyneuropathy, COPD, mini stroke, bulging disc, hypoglycemia, anxiety, depression, "elevated serritin level," nausea and vomiting, numbness and tingling, and a B12 deficiency. Tr. 257. The Social Security Administration denied Hugo's application and her motion for reconsideration. Tr. 80, 95. Hugo then requested a hearing before an Administrative Law Judge (ALJ). Tr. 111.

In January 2025, an ALJ held a hearing, during which Hugo and a vocational expert testified. Tr. 36–65. In March 2025, the ALJ issued a written decision finding that Hugo was not disabled. Tr. 18–31. The ALJ's decision became final on January 12, 2026, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Hugo filed this action on March 9, 2026. Doc. 1. She asserts the following assignments of error:

> 1. The ALJ erred when he improperly excluded and failed to consider the proffered opinions of the treating source.
>
> 2. At Steps Four and Five of the Sequential Evaluation, the ALJ's finding that Plaintiff could perform her past relevant work was not supported by substantial evidence.
>
> 3. The ALJ's finding that Plaintiff did not require the use of a cane or walker was not supported by substantial evidence and was contrary to Social Security Ruling 96-9p.

Doc. 7, at 1.

**Evidence**

*Personal and vocational evidence*

Hugo was 52 years old on the alleged disability onset date. Tr. 198. She completed the twelfth grade and last worked in 2020. Tr. 258.

*Relevant medical evidence*

The ALJ recited the medical history as follows:

> In terms of the claimant's alleged physical limitations and symptoms including pain and numbness, a review of the record shows that on April 13, 2020, the claimant followed up via video with Thomas Wagner, DO, about her degenerative disc disease and chronic pain. The claimant reported that her medications were providing enough pain relief to make a real difference in her life and were allowing her to remain productive with her activities of daily living. Dr. Wagner renewed the claimant's Hydrocodone-Acetaminophen 7.5-325 mg twice daily (3F/201-203).
>
> On July 1, 2020, the claimant returned to see Dr. Wagner for her 3-month medication check. The claimant reported that her medications were providing enough pain relief to make a real difference in her life and her pain relief was clinically significant. On examination, the claimant was in no acute distress. There was full range of motion of the neck. There was some tenderness to palpation of the lumbar and thoracic spine. The claimant's mood and affect were normal. Dr. Wagner continued the claimant's Hydrocodone, Tramadol, and Butalbital (3F/193-200).
>
> On December 16, 2020, the claimant had a video visit with Dr. Wagner. The claimant reported that her medications were providing enough pain relief to make a real difference in her life and her pain relief was clinically significant. Dr. Wagner continued the

claimant's Hydrocodone, Tramadol, and Fioricet (3F/187-190).

On August 3, 2021, the claimant had a video visit with Dr. Wagner. The claimant reported that her medications were providing enough pain relief to make a real difference in her life and her pain relief was clinically significant. Dr. Wagner continued the claimant's Hydrocodone, Tramadol, and Butalbital (3F/178-180).

On February 8, 2022, the claimant saw Dr. Wagner. The claimant reported that her medications were providing enough pain relief to make a real difference in her life and her pain relief was clinically significant. On examination, the claimant was in no acute distress. There was full range of motion of the neck. There was some tenderness to palpation of the lumbar and thoracic spine and left shoulder. The claimant's mood and affect were normal. Dr. Wagner continued the claimant's Hydrocodone and Tramadol and prescribed Prednisone for five days for left shoulder strain (3F/165-168).

On July 28, 2022, the claimant saw Dr. Wagner. The claimant reported that her medications were providing enough pain relief to make a real difference in her life and her pain relief was clinically significant. She also reported paresthesia in her lower extremities. On examination, the claimant was in no acute distress. There was full range of motion of the neck. There was some swelling of the lumbar region. The claimant's mood and affect were normal. Dr. Wagner continued the claimant's Hydrocodone, Tramadol, and Butalbital (3F/157-161).

On October 21, 2022, the claimant followed up with Dr. Wagner. The claimant reported again that her medications were providing enough pain relief to make a real difference in her life and her pain relief was clinically significant. On examination, the claimant was in no acute distress. There was full

range of motion of the neck. There was bilateral upper extremity weakness and paresthesia of the upper extremities. The claimant's mood and affect were normal. Dr. Wagner ordered an MRI of the claimant's cervical spine (3F/138-143).

On January 13, 2023, the claimant returned to see Dr. Wagner. The claimant reported that she had numbness and tingling in both feet and now having balance issues. She said she had an appointment with a neurologist at the end of the month. The claimant still reported that her medications were providing enough pain relief to make a real difference in her life and her pain relief was clinically significant. On examination, the claimant was in no acute distress. There was full range of motion of the neck. There was tenderness to palpation of the lumbar spine. There was diminished sensation of the legs. The claimant's mood and affect were normal. Dr. Wagner started Gabapentin for paresthesia and continued the claimant's Hydrocodone, Tramadol, and Butalbital (3F/128-133).

On February 9, 2023, the claimant told Dr. Wagner that with the Gabapentin, she had not noticed a difference and the numbness in her feet had not improved at all. Dr. Wagner suspected that more than one issue was occurring and vitamin deficiency might be causing the claimant's paresthesias so he started Folic Acid and Vitamin B-12 for paresthesia (3F/105-108).

On March 13, 2023, the claimant told Dr. Wagner that she still had numbness of the feet and had not seen any improvement. The physical examination was normal except for decreased sensation in a stocking pattern. Dr. Wagner diagnosed peripheral neuropathy and continued the claimant's Gabapentin, Folic Acid, and Vitamin B-12. Dr. Wagner also added Vitamin B6 to the claimant's daily vitamins to help with neuropathy symptoms, and if no change, he would consider ordering an EMG (3F/102-105).

On May 3, 2023, the claimant saw Dr. Wagner for medication refills. The claimant still reported that her medications were providing enough pain relief to make a real difference in her life and her pain relief including in her legs was clinically significant. The claimant reported that she recently had loss of feeling from the knees down in both legs that lasted about one day. The physical examination was normal except for decreased sensation of the lower extremities and weakness. Dr. Wagner refilled the claimant's Hydrocodone, Tramadol, Gabapentin, and B-12. For weakness of the legs, Dr. Wagner referred the claimant to neurology (3F/90-96).

On July 26, 2023, the claimant saw Dr. Wagner for medication refills. The physical examination was normal except for spasms and tenderness of the lumbar back (3F/84-90).

On September 8, 2023, the claimant was admitted to University Hospitals for neuropathy after presenting to the Emergency Department with a chief complaint of slurred speech, worsening neuropathy, and feeling off balance. In the Emergency Department, the claimant explained that she was recently diagnosed with peripheral neuropathy, and she had worsening peripheral neuropathy symptoms, weakness, and feeling off balance over the past week. However, she denied falling. The claimant admitted to drinking vodka almost every other day though she did not disclose the exact amount, but she stated that she had been drinking for a very long time. The claimant was also taking Tramadol and Hydrocodone for chronic back pain. The claimant was admitted for further care and management. The claimant was found to have low vitamin B6 and Folic Acid and her polyneuropathy was possibly nutritional. Dr. Zaheer highly recommended stopping all opioids. On September 10, 2023, the claimant was discharged to home in satisfactory condition with a diagnosis of peripheral neuropathy. At discharge, the physical examination was normal except for decreased

sensation of the lower extremities. Her medications included Gabapentin, Folic Acid, Pyridoxine, and Tramadol "as needed." The claimant was told to follow up on an outpatient basis with neurologist Dr. Andrew Wang and to schedule an EMG (2F/21, 51-54).

On October 17, 2023, the claimant returned to see Dr. Wagner. On examination, there was tenderness of the lumbar back and the claimant's gait and coordination were abnormal. Dr. Wagner prescribed Folic Acid-Vit B6-Vit B12, Riboflavin (Vitamin B-2), and Thiamine (Vitamin B-1) for vitamin deficiency related neuropathy (3F/77-82).

On December 5, 2023, the claimant returned to see Dr. Wagner about her neuropathy. She stated that she had been doing better with walking more but at night her pain increased due to being more active during the day (3F/70-76).

On January 8, 2024, the claimant told Dr. Wagner that her neuropathy was still the same with no change. She said she was still having a hard time with balance and finding herself holding onto things to help with balance. On examination, there was tenderness of the lumbar back and the claimant's gait and coordination were abnormal. Dr. Wagner continued the claimant's medications (3F/40-47).

On May 29, 2024, the claimant saw Dr. Wagner. The claimant reported that her pain medications were effective. The claimant complained of hand numbness, and having a hard time with balance and walking although this was not constant. On examination, there was 3/5 strength of the lower extremities and Dr. Wagner referred the claimant to physical therapy (3F/3-9). However, it does not appear that the claimant pursued physical therapy. From this, the undersigned finds that the claimant's symptoms and limitations are not as severe as alleged.

> On August 28, 2024, the claimant returned to see Dr. Wagner for medication refills. The claimant reported again that her medications were providing enough pain relief to make a real difference in her life and her pain relief was clinically significant. On examination, the claimant was alert and her mood was normal. The physical examination was normal except the claimant's gait was abnormal, there was tenderness of the lumbar back, and sensory deficit of the lower extremities (5F/48-54).
>
> On November 21, 2024, the claimant returned to see Dr. Wagner. The claimant stated that she had a rash on her entire body over the past two weeks. She said the rash was small, red, and bumpy, but it did not itch and was not painful. The physical examination was normal except for tenderness of the lumbar back and a rash on the arms and legs. Dr. Wagner diagnosed rash and prescribed Permethrin 5% cream (5F/13-17).

Tr. 25–28.

*State agency opinions*[2]

In January 2024, Douglas Chang, MD, reviewed Hugo's record. Tr. 79–84. Regarding Hugo's residual functional capacity,[3] Dr. Chang opined that

---

[2] When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[3] A residual functional capacity, or "RFC," is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant

Hugo could perform light exertional level work—stand, walk, and sit for six hours in an eight-hour workday, and lift 20 pounds occasionally and 10 pounds frequently. Tr. 82. She had postural and manipulative limitations. Tr. 83.

In July 2024, Steve McKee, MD, reviewed Hugo's record and agreed with Dr. Chang's opinion. Tr. 90–92.

*Hearing testimony*

Hugo, who was represented by counsel, and a vocational expert testified at the administrative hearing held in January 2025. Hugo testified that she used to work for an automotive-parts maker. Tr. 45. When asked how much weight she had to lift for that job, Hugo said that she didn't lift over ten pounds. Tr. 45. She stated that "[g]enerally, it would be 50 pounds" but she "was not allowed to lift over 10." Tr. 45. Hugo said that she wasn't allowed to lift more than ten pounds because of the disc disease in her back. Tr. 45–46. She said that she once took FMLA leave due to her back problems and migraines. Tr. 46.

Hugo stated that her back pain was mostly in her lower back. Tr. 46. She agreed that she experienced back spasms and stiffness. Tr. 47. Stretching sometimes helped alleviate her pain. Tr. 47. Hugo said that she could sit for 10 to 15 minutes before needing to stand and walk around. Tr. 47.

---

'can and cannot do."' *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

Hugo described peripheral neuropathy symptoms of numbness and tingling in her hands, legs, and feet. Tr. 48. She said that she could not open anything with a lid or use a can opener and she could not use a zipper. Tr. 48. She had problems writing and could not type. Tr. 48. Hugo said that she had balance problems and used a cane when she walked in her apartment. Tr. 49. When she went outside, she used a cane or a walker. Tr. 49. Hugo stated that when she rose from a seated position, she had to stand for a minute to get her balance before trying to walk. Tr. 49.

The ALJ discussed with the vocational expert Hugo's past work as a distributing clerk. Tr. 56. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Hugo could perform Hugo's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 56–57. The vocational expert answered that such an individual could perform Hugo's past work as she performed it and as it is generally performed. Tr. 57. Hugo's attorney objected to the job description that the vocational expert cited, and that ensuing discussion is described in detail below.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.

> 2. The claimant has not engaged in substantial gainful activity since April 15, 2020, the alleged onset date (20 CFR 404.1571 *et seq*.).
>
> 3. The claimant has the following severe impairments: degenerative disc disease of the lumbar and cervical spine and peripheral neuropathy (20 CFR 404.1520(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching, or crawling; must avoid more than frequent reaching in all directions; and avoid all exposure to hazards of unprotected heights.
>
> 6. The claimant is capable of performing past relevant work as a distributing clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).
>
> 7. The claimant has not been under a disability, as defined in the Social Security Act, from April 15, 2020, through the date of this decision (20 CFR 404.1520(f)).

Tr. 21–31.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the

burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec*., 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1. The ALJ did not improperly exclude opinion evidence*

Hugo argues that the ALJ improperly excluded opinion evidence that her attorney attempted to submit. Doc. 7, at 7.

The regulations state that a claimant "must make every effort to ensure that the administrative law judge receives all of the evidence and must inform [the Agency] about or submit any written evidence . . . no later than 5 business days before the date of the scheduled hearing." 20 C.F.R. § 404.935(a). If a claimant fails to "comply with this requirement, the administrative law judge may decline to consider or obtain the evidence" unless certain exceptions apply. *Id*. These exceptions are:

> (1) [The Agency's] action misled you;
>
> (2) You had a physical, mental, educational, or linguistic limitation(s) that prevented you from informing us about or submitting the evidence earlier; or
>
> (3) Some other unusual, unexpected, or unavoidable circumstance beyond your control prevented you from informing us about or submitting the evidence earlier. Examples include, but are not limited to:
>
> > (i) You were seriously ill, and your illness prevented you from contacting us in person, in writing, or through a friend, relative, or other person;
> >
> > (ii) There was a death or serious illness in your immediate family;
> >
> > (iii) Important records were destroyed or damaged by fire or other accidental cause; or
> >
> > (iv) You actively and diligently sought evidence from a source and the evidence was not received or was received less than 5 business days prior to the hearing.

20 C.F.R. 404.935(b).

At the administrative hearing, the ALJ began by discussing a function report completed by Hugo's husband that the ALJ received just that morning. Tr. 41. The ALJ indicated that Hugo's attorney had not referenced this report in his "5-Day letter." Tr. 41. Hugo's attorney responded that "I think the record is complete." Tr. 41. The ALJ said that despite the fact that the function report was "kind of based on surprise," he would include the report as an exhibit

unless the attorney objected. Tr. 41. Hugo's attorney indicated that he did not believe that this type of non-medical evidence was "extremely helpful," but he appreciated it if the ALJ would submit the letter. Tr. 41–42. The ALJ submitted the letter into the record. Tr. 42.

Later in the hearing, Hugo testified that she had problems finding work because of her "restrictions." Tr. 52. The ALJ asked, "who imposed these restrictions?" Tr. 52. Hugo answered, "Dr. Thomas Wagner." Tr. 52. After a discussion regarding Hugo's treatment for her impairments, the following exchange ensued:

> [ALJ]: And do you have anything from Dr. Wagner or anybody else that says what your limitations are and why you're so limited?
>
> [Hugo]: Dr. Wagner should have sent paperwork in.
>
> [ALJ]: I didn't see that in the record. Did I overlook something? That's possible. Counsel, did we get anything from …. Dr. Wagner?
>
> [Attorney]: We have the complete medical file. The medical records are at 5F. There's no medical source opinion, if that's what you're specifically asking about.
>
> [ALJ]: All right.
>
> [Attorney]: But all medical records are in the files. I want to make sure my client understands that.
>
> [ALJ]: Okay, all right. I just wanted to make sure you didn't overlook anything there. And okay. All right.

Tr. 53–54.

Then, the ALJ took testimony from a vocational expert about Hugo's past work. Hugo's attorney disagreed with the vocational expert's description of this work and objected to the vocational expert's finding, arguing that he believed that Hugo's past work was a different job. Tr. 58–61. The ALJ overruled the attorney's objection to the vocational expert as an impartial witness and stated:

> [ALJ]: I'm asking you to move on. What other evidence do you have to present that we actually have in the record?
>
> [Attorney]: I don't have any other evidence to present. What I plan to do is to put the two DOT[4] codes in the record, and the Court will see that [Hugo] performed essential functions of both jobs.

Tr. 61–62. Hugo's attorney continued to state his objection to the vocational expert and her testimony. Tr. 62. The ALJ explained:

> [ALJ]: Counsel, [the vocational expert] explained in the record that because of the weights lifted—I don't have anything in the record that says she was required to lift 50 pounds and that [her employer] w[as] making a special accommodation for her other than her own self-serving testimony.
>
> Now, the fact that it's self-serving doesn't mean it's irrelevant, but you've had time to get statements from the employer, and I don't see any of that in the record.
>
> [Attorney]: We don't have any information in the record. This is what was brought out. We had an entire part of this hearing dedicated to developing her work activity, which I think was developed well.

---

[4] DOT refers to the Dictionary of Occupational Titles.

> [Hugo] answered your question stating there were other individuals required to lift up to medium level. She has described essential functions consistent with the DOT, which I'm submitting in the record.
>
> ***
>
> I'll put my objections in the record.
>
> [ALJ]: Is there anything else additional, Counsel, that you would like to address to the vocational expert or otherwise?
>
> [counsel discussing his continued objection to the vocational expert's testimony]
>
> [ALJ]: I don't have anything further. Is the record complete to the best of your knowledge?
>
> [Attorney]: It's complete with the submission of those third-party statements. And we, again, thank the Court for submitting those despite the 5-Day letter.
>
> [ALJ]: And would you like some time to get something from the employer to substantiate that they were, in fact, accommodating Ms. Hugo?
>
> [Attorney]: Sure, I will certainly take that time. I appreciate it. And in the meantime, while I'm getting that, I will upload the two DOTs, so the Court can compare what I was trying to prove.
>
> [ALJ]: All right, and I do note then, I will keep the record open for two weeks to see if we can get something from the former employer.
>
> ***
>
> So other than what we've discussed as being outstanding, I'm closing the record….

Tr. 62–64. On January 29, the date after the hearing, the ALJ:

> sent a letter to Mr. Liner[5] advising him to submit additional evidence by February 13, 2025 (see Exhibit 14E) and on February 20, 2025, the undersigned sent another letter to Mr. Liner stating that the record was held open after the hearing for the above-referenced claimant so that he could submit additional evidence regarding employment accommodation. The undersigned also advised Mr. Liner that he neither submitted such evidence nor sent a request for more time, and if he did not send the evidence, request additional time, or satisfactorily explain why he could not submit the requested evidence within 10 days of the date of the letter, the undersigned would make a decision based on the available evidence (see Exhibit 15E). In a letter dated February 21, 2025 to the undersigned, Mr. November did not provide any evidence regarding employment accommodation. Instead, Mr. November submitted three medical source statements from Thomas Wager, DO, the claimant's primary care physician, dated December 13, 2024. Mr. November requested that pursuant to 20 CFR 404.935(b), the statements be admitted into evidence because "good cause" exists (see EF received from Mr. November on February 25, 2025). The undersigned declines to consider this evidence and declines to admit this evidence because the reasons given by Mr. November for missing the deadline to inform or submit this written evidence do not satisfy 20 CFR 404.935(b).

Tr. 18–19.

Hugo argues that the "good cause" provision for submitting late evidence was satisfied because her attorney "indicated that the medical opinions were inadvertently misplaced due to clerical error." Doc. 7, at 7. But a run-of-the-mill "clerical error" is not one of the "unusual, unexpected, or unavoidable

---

[5] Hugo was represented by Attorney Liner and Attorney November.

circumstances beyond [one's] control" contemplated by the regulations. *See* 20 C.F.R. § 404.935(b). This is especially so where, as here, the record documents the ALJ's: discussion with Hugo's attorney about the protocol for submitting evidence; questions at the hearing regarding potential additional evidence, including an opinion from Dr. Wagner; and an invitation to Hugo's attorneys to timely provide workplace evidence and "any additional evidence," Tr. 306, all of which were apparently ignored.

Hugo cites two cases in support of her argument that the ALJ improperly rejected her too-late evidence, Doc. 7, at 7, but neither of these cases found that *good cause* was satisfied due to a clerical error. In *Long v. Commissioner of Social Security*, the court found that the ALJ erred by not accepting medical evidence that Long received late despite Long's documented efforts to timely obtain the evidence. No. 1:20-cv-1490, 2021 WL 2530216, at *5 (N.D. Ohio June 21, 2021) (citing 20 C.F.R. § 404.935(b)(3)(iv) (the claimant "actively and diligently sought evidence from a source and the evidence was not received or was received less than 5 business days prior to the hearing.")). Hugo doesn't allege that she received the evidence late despite her best efforts to obtain it. She cites *Kobetic v. Commissioner of Social Security*, 114 F. App'x 171, 173 (6th Cir. 2004), in support of her assertion that the ALJ's error was not harmless. Doc. 7, at 7. But before this Court considers whether an error was harmless, there has to be an error in the first place. And Hugo has not shown that the ALJ erred.

*2. The ALJ's finding that Hugo could perform her past work is supported by substantial evidence*

Next, Hugo argues that the ALJ erred when he found that Hugo could perform her past relevant work. Doc. 7, at 8. The basis of Hugo's argument is that the ALJ "adopted the improper job title as past relevant work." *Id*. at 9.

At the hearing, the vocational expert classified Hugo's past relevant work as a distributing clerk, DOT 222.587-018. Tr. 56. The vocational expert testified that this was a light exertional job, both as Hugo actually performed it and as it is generally performed. Tr. 56. The vocational expert said that a hypothetical individual with Hugo's background and RFC could perform this job as performed "and per the DOT." Tr. 57.

Hugo's attorney disagreed that Hugo's past work could be classified as a distributing clerk. He urged the vocational expert to say that Hugo's past work was as a shipping-and-receiving clerk, DOT 222.387-050, which is a medium exertional job. Tr. 59. The vocational expert disagreed, pointing out that Hugo testified that at work she did not lift more than ten pounds. Tr. 59. Hugo's attorney countered that Hugo testified that two of her colleagues would lift up to 50 pounds, and he reasoned that if Hugo would have been required to do the same, the shipping-and-receiving clerk job "would be an applicable DOT title." Tr. 59. The vocational expert again disagreed, stating that Hugo wasn't using lift equipment or directing others. The vocational expert therefore "stuck with [her] original classification" that Hugo's past work was as a distributing clerk. Tr. 60. The vocational expert also pointed out that the shipping-and-

receiving clerk was an SVP-5[6] job, which made it "a skilled job," whereas the distributing clerk was a semi-skilled, SVP-3 job. Tr. 56, 60; *see* Soc. Sec. Ruling 00-04p, 2000 WL 1898704, at *3 (S.S.A. Dec. 4, 2000).

As a result of this discussion, the ALJ invited Hugo to submit evidence to support her argument that she performed her past work with an accommodation from her employer. Tr. 64. Hugo failed to submit any such evidence.[7] The ALJ ultimately accepted the vocational expert's testimony that Hugo's past work was as a distributing clerk, which, the ALJ explained, was based on the DOT. Tr. 31.

Other than saying that she disagrees with the ALJ's acceptance of the vocational expert's testimony, Doc. 7, at 9, Hugo hasn't identified an error that the ALJ made. She references the fact that the vocational expert "reli[ed] on the DOT," *id.*, but the DOT is "a reliable source of information" on which an ALJ may base a determination. *See O'Neal v. Comm'r of Soc. Sec.*, 799 F. App'x 313, 317 (6th Cir. 2020); 20 C.F.R. § 404.1560(b)(2) (stating that the Agency may rely on the DOT and vocational expert testimony when determining whether someone can perform past relevant work).

---

6 SVP stands for "specific vocational preparation." Soc. Sec. Ruling 00-04p, 2000 WL 1898704, at *3 (S.S.A. Dec. 4, 2000).

7 Dr. Wagner's December 2024 opinions, which Hugo attempted to submit late to the ALJ, did not show evidence of a work restriction that Hugo was under when she worked in 2020. Tr. 66–77.

Hugo appears to focus her challenge on the vocational expert's impartiality. She contends that the vocational expert "refused to change her mind regardless of the evidence presented as it was contended that [Hugo] did not perform a skilled job." Doc. 7, at 9. To the extent that Hugo's argument rests on the job's skill level, she has not explained this argument and so she has forfeited it. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited]. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted). And Hugo's contention that the vocational expert "refused to change her mind" doesn't show that the vocational expert's testimony was faulty. As the ALJ aptly observed, "[j]ust because you want [the vocational expert] to say something else doesn't make her a non-impartial witness." Tr. 61.

*3. The ALJ's RFC determination is supported by substantial evidence*

Hugo asserts that "[b]ased on the combination of [her] problems limiting her ability to stand/walk the requisite 6 hours a day and use her hands and arms on more than an occasional basis, the ALJ's determination that she could perform her past work was not supported by substantial evidence requiring a reversal or remand of this matter." Doc. 7, at 10. In support of this argument, Hugo summarizes the medical evidence. *Id*. at 10–11. She concludes:

> the ALJ in this matter incredulously found that [Hugo] could stand/walk 6 hours a day as required

> to perform the incorrectly identified past work. This finding was contrary to the evidence in this matter. This inconsistency between the ALJ's conclusion that Plaintiff could perform work at the light level of exertion and the medical evidence established that the ALJ's RFC was not supported by substantial evidence requiring a reversal or remand of this matter.

*Id*. at 12. Other than saying so, Hugo has not described how she believes the ALJ erred. She hasn't said that the ALJ misconstrued any evidence. She hasn't challenged the ALJ's evaluation of Hugo's allegations of her limiting symptoms and she hasn't challenged the ALJ's evaluation of the opinion evidence. Simply put, Hugo has not shown that the ALJ's RFC is unsupported by substantial evidence.

*4. The ALJ did not err when evaluating Hugo's need for a cane or walker*

Finally, Hugo argues that the ALJ erred when he found that Hugo did not need to use a cane or a walker. Doc. 7, at 12.

If an assistive device is "not a necessary device for [a] claimant's use, it cannot be considered an exertional limitation that reduce[s] [the claimant's] ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). To be considered a restriction or limitation, an assistive device "must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the [device] is medically necessary." *Murphy v. Astrue*, No. 2:11-cv-114, 2013 WL 829316, at *10 (M.D. Tenn. March 6, 2013) (citations omitted). To be medically necessary, the record must reflect "more than just a subjective desire on the part of the plaintiff as to the use of a[n] [assistive device]." *Id*.

(citation omitted). And there must be medical documentation "describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." Soc. Sec. Ruling 96-9p, 1996 WL 374185, *7 (S.S.A. July 2, 1996); *see Golden v. Berryhill*, No. 1:18-cv-636, 2018 WL 7079506, at *19 (N.D. Ohio Dec. 12, 2018) ("a cane prescription [that] does not indicate 'the circumstances for which [the cane] is needed,' … does not fulfil the requirements under SSR 96-9p"), *report and recommendation adopted*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). Generally, an ALJ's finding that an assistive device is not medically necessary is error when the claimant was prescribed an assistive device and the ALJ didn't include the use of the device in the RFC without providing an explanation for omitting it. *Cruz-Ridol v. Comm'r of Soc. Sec.*, No. 1:17-cv-1075, 2018 WL 1136119, at *15 (N.D.Ohio Feb. 12, 2018) (citing *Watkins v. Comm'r of Soc. Sec.*, No. 1:16–cv–2643, 2017 WL 6419350, at *11 (N.D. Ohio Nov. 22, 2017)), *report and recommendation adopted*, 2018 WL 1083252 (N.D. Ohio Feb. 28, 2018).

Hugo argues that "the ALJ failed to detail the evidence which supported the need for an assistive device." Doc. 7, at 12. Hugo contends that she testified that she needs a cane in her apartment for balance and she used a walker "when outside her apartment." *Id.* She submits that Dr. Wagner in November 2023 and the consultative examiner in January 2024 observed that Hugo walked with an assistive device. *Id.* But the ALJ stated that Hugo testified

that she "has balance problems, so she uses a cane in her apartment, and she uses a cane or walker when outside of her apartment." Tr. 25, 29. The ALJ also recognized that "[o]n November 7, 2023, Dr. Wagner noted that [Hugo] was using a walker" and that "[o]n January 2, 2024, Dr. Ginsberg [the consultative examiner] noted that [Hugo] 'walked with a walker' and 'brought a cane' to the appointment." Tr. 29. So the ALJ did not fail to detail this evidence, as Hugo alleges.

Hugo argues that the ALJ erred when he concluded that a cane or walker wasn't medical necessary. Doc. 7, at 13–14. In support of her argument, she summarizes the evidence. *Id*. But merely citing evidence and disagreeing with the ALJ's conclusion does not show that the ALJ's decision lacks substantial evidence. *See, e.g., Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) ("The decision of an ALJ is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ."). The ALJ explained that other than the two instances in the record cited above, "the medical evidence of record reflects no use of a cane or walker." Tr. 29. He noted that Hugo had fair strength in her lower extremities and had not sustained falls. Tr. 29. And elsewhere in his decision, the ALJ commented that Hugo did not follow up with a neurologist for neuropathy as instructed; she did not attend physical therapy as recommended; and she received care on a "regular basis" but "has not required or received frequent care for any

medically determinable physical impairment." Tr. 28–29. Hugo has not challenged any of these findings. The ALJ's finding regarding Hugo's use of an assistive device was in the "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *See Lindsley*, 560 F.3d at 605.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: September 3, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).